[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 15, 2004
THOMAS K. KAHN
CLERK

———————————————

No. 03-14723

———————————————

D. C. Docket No. 02-21057 CR-FAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAHZIEL PINEIRO,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

———————————————

(November 15, 2004)
**(As Amended January 7, 2005)**

Before HULL and MARCUS, Circuit Judges, and HANCOCK[*], District Judge.

MARCUS, Circuit Judge:

———————————

[*] Honorable James H. Hancock, United States District Judge for the Northern District of Alabama, sitting by designation.

The opinion issued on November 15, 2004 is hereby corrected and substituted with the following:

Jahziel Pineiro appeals his convictions, arising from a jury verdict, for one count of conspiracy to manufacture marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), 846; one count of maintaining a place for the purpose of manufacturing marijuana, in violation of 21 U.S.C. § 856 and 18 U.S.C. § 2; and two counts of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). Pineiro argues that the district court erred by denying his pre-trial motion to suppress, and that the evidence was insufficient to support his drug-related convictions. We affirm.

## I.

The relevant facts and procedural history are these. On April 25, 2003, by superseding indictment, Pineiro was charged with: beginning in or about February 2002 and continuing through on or about December 13, 2002, conspiring to manufacture 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), 846 (Count I); manufacturing 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii) (Count II); maintaining a place for the purpose of manufacturing marijuana, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count III); possession of a firearm in furtherance of a drug

2

trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count IV); possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) (Count V); and possession of ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) (Count VI). The indictment also included a forfeiture count.

Prior to trial, Pineiro moved to suppress evidence seized and statements made in connection with a warrantless search of his property, arguing that: the police lacked probable cause to search his home without a warrant; any consent he gave was involuntary; the search exceeded the scope of such consent; he was not given Miranda[1] warnings; and his statements were coerced.

At an evidentiary hearing on Pineiro's motion to suppress, the magistrate judge considered the following testimony. FBI Special Agent Martin Pettit stated that, in October 2002, he received information about a marijuana-growing operation at multiple locations in Miami, Florida. His subsequent investigation led to surveillance of a house located at 16001 S.W. 98th Avenue ("16001 House"). During surveillance at this location, Agent Pettit observed Pineiro's black Chevy Tahoe sports utility vehicle ("SUV"), which had white lettering on the side, parked outside. He subsequently obtained a warrant to search the 16001

---

[1] Miranda v. Arizona, 384 U.S. 436, 458-71, 86 S.Ct. 1602, 1619-26, 16 L.Ed.2d 694 (1966).

House.  During his search on December 12, 2002, Pettit discovered a fully functional marijuana grow site on the premises.  Also at the 16001 House, the agents encountered Lazaro Vazquez, who denied knowing Pineiro[2] and who was subsequently arrested.  In the course of his investigation of the 16001 House, Pettit learned that two other homes were associated with this location.  Based on this information, four special agents went to the next house associated with the 16001 House, this one at 25768 S.W. 123rd Court ("25768 House"), where they encountered Pineiro.

Prior to obtaining Pineiro's consent to search the 25768 House, the agents spoke with Pineiro's parents and brother, all of whom lived directly across the street from the 25768 House.  After Special Agent Pettit told the family he wished to speak with Pineiro, Pineiro's brother phoned him and, about 45 minutes later, Pineiro arrived in a van.  The agents approached the van and identified themselves.  They were armed, but their weapons were concealed.  They told Pineiro they wanted to look around the 25768 House.  Pineiro agreed, but stated he wanted to secure his dog before the agents entered the house.

---

[2]  We have no occasion to look at the admissibility of Vazquez's statement, either at the suppression hearing or at the subsequent trial, because no error has been raised on appeal.

After Pineiro secured the dog in the garage, he walked with the agents through the house. Special Agent Pettit testified that Pineiro never indicated that he did not want the agents to enter his house, nor did he limit the scope of their search. Pineiro refused to sign a consent-to-search form, but verbally consented to the search. According to Agent Pettit, Pineiro moved the dog from the garage to permit agents to search the garage. During the search of the premises, Special Agent Pettit observed a partially dismantled grow room in one of the bedrooms, a marijuana plant in the backyard, and marijuana leaves on the floor throughout the house. The other agents found drug paraphernalia in the laundry room and more marijuana leaves and clippings concealed in garbage bags in the garage. In the house, specifically, the agents discovered construction debris, buckets, potting soil, clipping scissors, leaf fragments of suspected marijuana, a ballast or transformer used to power grow lights, a scale and tray used for weighing drugs, and a three-sided box or "hood" used for growing marijuana. In the kitchen, agents found a picture of Pineiro standing alongside trays of growing marijuana plants and holding a "bong" -- a device used to smoke marijuana. Finally, in the garage, the agents also found PVC pipes commonly used as irrigation tubes in hydroponic marijuana grow operations.

Agent Pettit read Pineiro his Miranda rights and questioned him. Pineiro signed a Miranda-rights waiver form and informed Pettit he had moved into the house on November 16, 2002, and admitted that the plants and drugs in the house belonged to him. When Pettit informed Pineiro of the search at the 16001 House on the prior day, Pineiro explained that the 16001 House belonged to his cousin (Vazquez). Pineiro, who described himself to Agent Pettit as a "pot-head," initially denied having any weapons and claimed the marijuana was not his, but that it had been in the house when he moved in. He later recanted and told Pettit he had constructed the apparatus in the dismantled grow room to cultivate marijuana. He also later directed agents to a gun case. The agents then asked Pineiro for permission to search his van and Pineiro consented, after which the agents found more marijuana leaves and planting materials in the van.

In support of his motion to suppress, Pineiro testified he had been living at the 25768 House for only two weeks when he was arrested. He stated that agents asked to "look around," but did not indicate that they wished to search his home. According to Pineiro, he thought the agents would only walk through his house, but would not open things and look everywhere. Pineiro also claimed he was not advised of his Miranda rights until after he was questioned and arrested.

The magistrate judge recommended denying the motion to suppress. Based on the testimony at the evidentiary hearing, the magistrate judge concluded that Pineiro gave consent to search and that his consent was voluntary. The magistrate judge observed that there was no evidence the agents used any force or threats to secure the consent. The magistrate judge further found that law enforcement officers advised Pineiro of his rights, but were not required to inform him he had the right to refuse consent. Over Pineiro's objections, the district court adopted the recommendation and denied the motion to suppress.

At trial, Special Agent Pettit presented testimony that was, in all material respects, consistent with the testimony he provided at the suppression hearing. He described for the jury the special agents' recovery of the following evidence at the 16001 House, the fully functional grow house where Pineiro's cousin and co-conspirator, Vazquez, was arrested: 131 marijuana plants in growing trays; fluorescent light fixtures (commonly used in marijuana grow houses for its ability to provide a broad spectrum of light but a low level of heat); and multiple strips of rockwool (a soil substitute commonly used in hydroponic marijuana grow houses).

The next day, when the agents conducted a search of the 25768 House, they discovered the following evidence indicating, in Pettit's opinion, that the house was a dismantled grow house: a high-pressure cylinder and safety cap (used to

7

store carbon dioxide during the grow process); buckets and potting soil; clipping scissors; PVC pipes (commonly employed as irrigation tubing for hydroponic marijuana cultivation); leaf fragments of marijuana; a ballast or transformer (used to power "grow lights"); a scale and tray (for weighing drugs); a foil-backed insulation board; and strips of rockwool. Pettit also discovered a three-sided box, which was a home-made "hood," used to grow marijuana. In one of the bedrooms, Pettit testified that construction debris littered the floor and that the door had been removed from the hinges. An air-conditioning unit was sitting on the floor and a container of potting soil, and soil itself, were observed on the floor of this bedroom. After Pineiro also consented to a search of his van parked outside, agents found similar materials inside.

Pettit then described the third house searched, this one on December 13, 2002 right after completion of the search at the 25768 House. The third house was located at 20535 Marlin Road ("Marlin Road House") and owned by Vazquez, who had been arrested in connection with the search of the 16001 House on the previous day. At this house, the agents found another active grow site and recovered 194 marijuana plants.

Pettit, who had investigated over 20 dismantled or fully functional grow houses during his career, opined that the operations at the Marlin Road House

8

were "very similar to" the operations at the 16001 House. More specifically, Pettit described the following equipment -- similar to materials he had seen just the day before at both the 16001 House and the 25768 House: the same style and type of fluorescent lightbulbs used in the operation of hydroponic grow houses; blocks of rockwool; rows of ballasts; and a foil-backed insulation board. In the Marlin Road House, in one of the rooms that had been equipped for hydroponic growing, Pettit saw, as he had also seen in the 25768 House, an extra air conditioning unit, which, he explained, served to cool the room and balance the higher temperature given out by the fluorescent lighting. Notably, during the search of the Marlin Road House, Pettit observed that Pineiro's phone number appeared twice on the "caller i.d." unit. These calls took place on December 4 and 5, 2002 (during the charged time period for the conspiracy), which was within the week prior to Pineiro's and Vazquez's arrests.

In addition to Pettit's testimony, the government presented testimony from neighbors to two of the houses (the Marlin Road and 25768 Houses). Lance Rafford testified that his mother lived across the street from the Marlin Road House and that he had seen a black SUV with white lettering at the Marlin House on three or four occasions during 2002. That same year, Artavius Williams, who

9

lived in the house directly behind the 25768 House noticed that bright lights remained on at all times of the day and night at that house.

Rosa Millon-Roque, the owner of the 16001 House and, thus, both Pineiro's and Vazquez's landlord during the relevant time period, testified that she rented the house for a one-year term to Pineiro, starting in February 2002. On or about February 13, 2002, Pineiro filled out a lease application, listing the 25768 House as his current address. According to Millon-Roque, when he applied to rent the house, Pineiro asked how often she planned to visit the property, and she informed him that she never visited her rented properties. She noted, however, that when she later decided to refinance the property and the appraiser wished to visit the house, Pineiro told her that he did not want someone coming to the house when he was not at home. On November 20, 2002 (during the period of the conspiracy), Pineiro phoned Millon-Roque and indicated he wanted to break the lease. Millon-Roque replied that she would try to find another renter immediately. Later that same day, Pineiro called Millon-Roque and said he had found a friend who wanted to rent the house and had the money to make the three required payments. He indicated that this friend, who, as it turned out, was Vasquez, "knows the house." Six days later, Vasquez moved into the residence after signing a new lease, the term of which included the two-month period remaining on the lease Pineiro had

10

broken.  During Millon-Roque's testimony, the government introduced lease documents associated with Vazquez's rental of the 16001 House, including, notably, his lease application on which he listed Pineiro as a reference.

At the end of the government's case-in-chief,  Pineiro moved for judgment of acquittal on all counts. The court denied the motion as to Counts I, III, V, and VI, but granted the motion on Counts II (manufacturing 100 or more marijuana plants) and IV (possession of a firearm in furtherance of a drug trafficking offense).

In his defense, Pineiro called three witnesses.  First, his father, Hugo, testified that he lived across the street from the 25768 House.  According to Hugo, Pineiro lived at the 25768 House for about two weeks, having moved from the 16001 House before he was arrested.  Hugo visited the 16001 House and never observed any drugs.  Pineiro's second witness, Corey Blue, testified that he too lived near the 25768 House and that he took odd jobs as a handyman.  He stated that he helped Pineiro repair and clean the 25768 House after Pineiro bought the house in November, approximately three weeks before the arrest.  According to Blue, the previous tenants left the house dirty and filled with trash and other debris.  He testified that he had been working with Pineiro to clean the house for

11

about three weeks and that he had worked for five days each of those weeks. Blue stated he never saw any drugs or guns in the house.

Finally, Pineiro's wife, Jacqueline, testified that she and her husband moved into the 25768 House in November 2002, and that the house needed a lot of maintenance work. According to Jacqueline, she and her husband had previously rented the 25768 House for a year, prior to moving to the 16001 House, which they rented for a year before moving back to the 25768 house after purchasing it. She admitted that her husband smoked marijuana, but claimed she never saw any marijuana growing in the house. Jacqueline also testified, as Pineiro had stated to Pettit during the search of the 25768 House, that Vazquez was Pineiro's cousin.

The jury subsequently found Pineiro guilty of Counts I, III, V, and VI. After the verdict, Pineiro moved for a new trial, arguing that the evidence was insufficient to show a conspiracy or that he maintained a place for the purpose of manufacturing marijuana. The district court summarily denied the motion.

At sentencing, based on an adjusted offense level of 20, a criminal history category III, and the 60-month statutory minimum mandatory on Count I, see U.S.S.G. § 5G1.1(b),[3] the district court sentenced Pineiro to a 60-month term of

---

[3] Section 5G1.1(b) provides: " Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(b).

imprisonment on each count, to run concurrently, four years of supervised release, and a $100 special assessment as to each count. This appeal followed.

II.

A.

First, Pineiro argues that the district court erred by denying his motion to suppress evidence seized at the 25768 House because the agents conducted a warrantless search without his consent, or, alternatively, any consent he gave was involuntary, as he was not advised of his right to refuse consent. Pineiro also challenges the admissibility of statements he made after Special Agent Pettit advised him of his <u>Miranda</u> rights. He argues that any incriminating statements were coerced and taken in violation of <u>Miranda</u>.

Based on our careful review of the record, including the transcript of the suppression hearing, we are satisfied that the government established, by a preponderance of the evidence, both that Pineiro consented to the search at the 25768 House and that his consent was voluntary. <u>See</u> <u>United States v. Blake</u>, 888 F.2d 795, 798 (11th Cir. 1989) ("The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.") (citation omitted). Special Agent Pettit testified that Pineiro led investigators on a tour of

13

his home and that he cooperated with their search efforts. His cooperation included moving his dog into the garage and then into the yard to enable the agents to enter. The agents first identified themselves and explained the purposes of their search. And, although at least four agents entered Pineiro's home and the agents were armed, no one had a gun drawn and the guns were not visible.

Pineiro presented no evidence to show that there was anything inherently coercive in the search. Moreover, in denying the motion to suppress, the magistrate judge found Pettit's testimony that Pineiro verbally consented to the search to be more credible than Pineiro's version of the events. Such a credibility finding is within the province of the factfinder. United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002), cert. denied, 537 U.S. 1114 (2003). On appeal, Pineiro has not shown clear error in the trial court's factual findings, which this Court will not reverse "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." See id. (citation omitted). In short, viewing the totality of the circumstances, the district court properly concluded that Pineiro consented to the search and that his consent was voluntary.[4]

---

[4] To the extent Pineiro suggests that the police were required to be more specific in advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument. See United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999)

14

The district court also did not err by denying Pineiro's motion to suppress his inculpatory statements based on Miranda. Again, according to Pettit, he informed Pineiro of his rights before questioning. Other than his own version of the events, Pineiro presented no evidence to the contrary in the district court. See Ramirez-Chilel, 289 F.3d at 749 ("[I]n evaluating the factual version of events between the law enforcement officers and [the defendant], we should defer to the [court's] determinations unless [its] understanding of the facts appears to be 'unbelievable.'"). The magistrate judge found that Pettit's testimony was more credible than Pineiro's contradictory testimony. On this record, the district court did not clearly err in its factual findings, nor did it incorrectly apply the law to the facts. See United States v. Goddard, 312 F.3d 1360, 1362 (11th Cir. 2002), cert. denied, 538 U.S. 969 (2003).

## B.

In reviewing Pineiro's challenges to the sufficiency of the evidence to support his convictions on Counts I and III, we apply a de novo standard of review, but resolve all reasonable inferences in favor of the jury's verdict. See United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999). The evidence is

(finding that the failure to inform the suspect that he had the right to refuse consent would not invalidate otherwise valid consent) (citation omitted).

15

sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt. United States v. Lluesma, 45 F.3d 408, 409-10 (11th Cir. 1995). Indeed, a verdict of guilty cannot be disturbed if there is substantial evidence to support it, "unless no trier of fact could have found guilt beyond a reasonable doubt." United States v. Lyons, 53 F.3d 1198, 1202 (11th Cir. 1995) (citation omitted).

As for the sufficiency of the evidence, Pineiro first argues that the record was insufficient to support his conviction for maintaining a place for the purpose of manufacturing marijuana because the government did not establish when the dismantled grow house was functional (*i.e.*, before or after he purchased and moved into the house), or when it had been dismantled. He urges that the government's evidence showed only that he bought the house a few weeks before his arrest and that he had been cleaning and repairing the house from the previous owner's mess.[5]

---

[5]To the extent that Pineiro asserts that the indictment's language, "on or before December 13, 2002," permitted the government to go back in time indefinitely to when there was a functioning grow house at the 25768 House, his argument is unpersuasive. Not only did he fail to raise this issue in the district court in connection with the indictment, but the government's evidence at trial was consistent with the language of the indictment: the evidence showed that the 25768 House contained a functioning grow house while under Pineiro's ownership.

To convict under § 856, a jury must find "that the defendant (1) knowingly, (2) operated or maintained a place, (3) for the purpose of manufacturing, distributing, or using any controlled substance." United States v. Clavis, 956 F.2d 1079, 1090 (11th Cir. 1992). Thus, "[t]he offense requires two mental elements, knowledge and purpose. The purpose element applies to the person who is charged with maintaining the place for the illegal activity. It is not sufficient that others possess the requisite purpose." Id.

Here, there was an abundance of evidence from which a trier of fact, choosing among reasonable interpretations of the evidence, could find, beyond a reasonable doubt, that Pineiro was guilty of knowingly maintaining a place for the purpose of manufacturing marijuana. Again, Special Agent Pettit testified that during the search of the 25768 House, the agents recovered green leafy material (which later tested positive as marijuana), clipping scissors, pots, potting soil, potting containers, ballasts, grow lights, a foil-backed insulation board, rockwool, and construction debris -- all of which are consistent with equipment and materials used in grow houses. Pettit also said that Pineiro admitted to constructing the grow areas. Moreover, agents found a picture of Pineiro standing alongside trays of growing marijuana plants and holding a bong. Finally, neighbor Williams said that he could smell marijuana coming from the 25768 House between January and

17

June 2002 and that he had observed lights on at the house at all hours of the day and night. On the basis of this evidence, alone, the government established beyond a reasonable doubt the elements required to convict under § 856.

Pineiro's theory of defense at trial, like his argument on appeal, is that the evidence seized during the search of the 25768 House, including the dismantled grow house, belonged to the prior tenant and not him. Although Pineiro presented testimony that would support this theory of the case, the jury was free to reject (as it did) the defense explanation of the evidence and find Pettit and Williams more credible. Indeed, on this record, the jury reasonably also could have inferred that Pineiro maintained the grow house from the fact that Pineiro lived in the house containing tools, trash, and leaves connected to a grow house, both within the house and in its garage. Moreover, Special Agent Pettit testified that Pineiro confessed to ownership of the grow materials, although he later recanted the admission. This too satisfied the government's burden to establish a knowing and intentional violation of § 856.

We are likewise unpersuaded by Pineiro's challenge to the sufficiency of the evidence to support his conspiracy conviction, although this is a closer question. "To support a conspiracy conviction, the government must prove '(1) an agreement between the defendant and one or more persons, (2) the object of which

18

is to do either an unlawful act or a lawful act by unlawful means.'" United States v. Smith, 289 F.3d 696, 706 (11th Cir. 2002) (citation omitted). The government must prove that "a conspiracy existed, that the defendant knew of it, and that defendant, with knowledge, voluntarily joined it." United States v. Ryan, 289 F.3d 1339, 1346 (11th Cir. 2002). The government may show participation in the conspiracy by circumstantial evidence, if not by direct evidence, United States v. Anderson, 326 F.3d 1319, 1329 (11th Cir. 2003) (citing Lyons, 53 F.3d at 1198), and it need prove only that Pineiro knew the general nature and scope of the conspiracy. United States v. Clark, 732 F.2d 1536, 1539 (11th Cir. 1984)

Pineiro primarily challenges the government's evidence as to the first requirement -- an illegal agreement between the defendant and one or more conspirators. Pineiro claims that the government showed only that he knew Vazquez, but failed to establish that Vazquez was ever present at the 25768 House, had ever called the 25768 House, or had any connection to the house. Pineiro also asserts that the government did not sufficiently connect him (Pineiro) to the drugs found at the 16001 House or the Marlin Road House, both of which Vazquez owned or occupied during the charged time period of the conspiracy (beginning in or about February 2002 and continuing through on or about December 13, 2002). We disagree.

19

Not only did numerous witnesses testify that Pineiro knew Vazquez, but the government also presented evidence that the two men were cousins. Moreover, when Vazquez moved into the 16001 House, he listed Pineiro as a reference on his lease application. And, when Pineiro sought to break his lease early at that house, he was able to produce Vazquez to sign a new lease (that would include the two-month term left on Pineiro's lease) on the very day he informed Millon-Roque of his intent to vacate the house early. He even told her that the new tenant "knew the house." Indeed, only three weeks later, on December 12, 2002, the agents searched the 16001 House, just recently vacated by Pineiro and then occupied by his cousin Vazquez, and discovered a substantial marijuana growing operation.

The government also presented testimony that an SUV generally matching the description of Pineiro's vehicle was parked in front of both the Marlin Road and 16001 Houses during the charged period of the conspiracy (again, beginning in or around February 2002 and continuing through on or about December 13, 2002). During his October 2002 surveillance of the 16001 House, where he subsequently executed a search warrant and arrested Vazquez, Special Agent Pettit observed a black Chevy Tahoe SUV with "custom rims." The SUV Pettit saw had advertising on its side "with the wording of a yacht repair business . . . Atlantics . . . Motor Yacht Maintenance and Repair," which is the name of the company

20

Pineiro owned. Neighbor Rafford testified to seeing, three or four times in 2002, a black SUV that he thought had "chrome rims" and "white lettering . . . about some kind of driving school" parked outside of the Marlin Road House, which, it was undisputed, was owned by Vazquez. Moreover, when Vazquez signed the lease at the 16001 House, he also owned the Marlin Road House. And, as we have noted, during a search of the Marlin Road House, police observed Pineiro's phone number twice on the "caller i.d." unit. Both calls were placed during the week prior to the search and within the time frame of the conspiracy.

In addition to the abundant evidence establishing a close personal relationship between Vazquez and his cousin Pineiro, notably a relationship that Vazquez denied when he was arrested at the 16001 House by claiming he did not even know Pineiro, Special Agent Pettit testified at length about the substantial similarities between the dismantled grow house at the 25768 House and the existing grow houses at the 16001 House and Marlin Road House. Simply put, the houses associated with both Pineiro and his cousin Vazquez contained the same materials, including: fluorescent lighting, extra air conditioning units, buckets and pots, planting soil and related materials, foil-backed boards for light enhancement, extra vents and fans for cooling, and rockwool material. The similarity between the dismantled grow house under Pineiro's control and the two operational grow

houses under Vazquez's control, all within the time period alleged in the indictment, is further circumstantial evidence of an illegal agreement to work together to manufacture marijuana.

It is well-settled that the "existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement. . . . The more common method of proving an agreement is through circumstantial evidence." United States v. Morales, 868 F.2d 1562, 1574 (11th Cir. 1989). Indeed, "[b]ecause the crime of conspiracy is 'predominantly mental in composition,' it is frequently necessary to resort to circumstantial evidence to prove its elements." United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998) (quoting United States v. Shabani, 513 U.S. 10, 16, 115 S. Ct. 382, 386, 130 L. Ed. 2d 225 (1994)). Thus, it is not enough to discard a jury's finding of a conspiracy simply because the government did not present direct evidence of an illegal agreement. We also look to the weight of circumstantial evidence before undertaking the severe remedy of overturning a jury verdict. After undertaking a thorough review of this record, we cannot say that no trier of fact could find guilt beyond a reasonable doubt. See Lyons, 53 F.3d at 1202. Based on all of the evidence, a reasonable jury could have found an illegal agreement between the cousins, Pineiro and Vazquez, to manufacture marijuana.

**AFFIRMED.**

22