[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 16, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12491
Non-Argument Calendar

_____

D. C. Docket No. 02-00528-CR-BE-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EVERETT LEON STOUT,    Defendant (dismissed 8-15-05),

HAROLD TYRONE HARMON, SR.,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(December 16, 2005)

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Harold Tyrone Harmon, Sr., directly appeals his convictions following a jury trial for one count of conspiracy to commit interstate transportation of stolen vehicles, in violation of 18 U.S.C. § 371, and two counts of interstate transportation of stolen vehicles, in violation of 18 U.S.C. § 2312. Harmon argues on appeal that the government produced insufficient evidence to support his convictions. For the reasons set forth more fully below, we affirm.

A federal grand jury returned an 18-count superseding indictment against Harmon and two co-conspirators, Everett Leon Stout and Shirley Joan Harper, charging Harmon as discussed above.[1] During a consolidated trial, at which Harmon and Stout elected to proceed pro se, but with standby counsel present, Thad Hood of Alabaster, Alabama, testified that he and his wife placed an advertisement in the Birmingham newspaper, attempting to sell their 2001 Pontiac Firebird. In December 2001, in response to this advertisement, Stout came to the Hoods' residence to look at the Firebird. After quickly examining the Firebird, Stout agreed to purchase it for the asking price, which was the amount the Hoods still owed the Alabama Telco Credit Union ("Telco"), the company that had financed the original sale of the Firebird. Stout, who falsely claimed he was an

---

[1] Pursuant to a plea agreement, Harper pled guilty to the conspiracy charge. Following a consolidated trial, a jury convicted Stout and Harmon as charged. Although Stout filed a pro se notice of appeal from his judgment of conviction, this Court subsequently dismissed his appeal for want of prosecution. Thus, this appeal is only from Harmon's judgment of conviction.

attorney, then went with the Hoods to obtain a copy of the vehicle's title, along with instructing the Hoods that they all needed to go to the local courthouse to record the "sale" documents.

Hood further testified that, at the courthouse, Stout filed paperwork, including a bill of sale and a document—containing the words "negotiable instrument" and "Diamond Financial"—that Stout claimed would serve to pay the debt owed to Telco. Diamond Financial, which Stout told Hood was "one of his other businesses," had listed as its address Harmon's home address, that is, 2050 South School Avenue, Fayetteville, Arkansas. Stout also told the Hoods that the "negotiable instrument" would operate like a money order, such that the funds for the "sale" would come from "Conseco Financial," a company against which Stout claimed he had a judgment.[2] Stout had copies of this transaction (1) recorded in the probate court; (2) sent to Telco; and (3) left with the Hoods, along with Harmon's name and number to contact if the Hoods had difficulties. The Hoods, in turn, gave Stout the keys to, and possession of, the Firebird.

Hood and his wife subsequently received notice that their car payment was late. When Hood contacted Telco, he was informed that the payment had not been

---

[2] Although this "negotiable instrument" contained on its face a reference to the "Judgment Recorded as Case Number CV-99-744 in the Circuit Court of Crittenden County, Arkansas," no such judgment existed, and the "negotiable instrument" was worthless.

paid, and that he still was liable for the debt. Hood then called Harmon's phone number, and a man identifying himself as "Harold" responded and told Hood that "your check has been in the mail, it's been put in the mail." Hood, however, never received a check, and the debt was never paid. The government also introduced testimony from six other witnesses, who, with minimal variations, described the same scheme Stout had used to steal the Hoods' Firebird.[3]

Ivy Lillard, one of Stout's close friends, also testified, explaining that, through her relationship with Stout, she learned that he conducted "business" by filing judgments against people through Sovereign Accounting, and financed cars using "negotiable instruments" through Diamond Financial in Atlanta, Georgia. She also stated that Harmon was associated with Sovereign Accounting and Diamond Financial, including serving on Sovereign Accounting's "board." Moreover, both Stout and Harmon, through Sovereign Accounting, participated in a day-long training session in West Memphis in early 2000, which was conducted to teach other people how to use the negotiable instruments to purchase property on behalf of Sovereign Accounting.[4]

---

[3] This related testimony involved thefts of vehicles in December 2001 and January 2002, from Kevin and John Brown, Kevin Oakes, Timothy Sheridan, Angela and Charles Woods, Jill Potts, and James Stuckey. Unlike Hood, however, none of these witnesses testified that they spoke with a man named "Harold" after the purported sales.

[4] Videotapes of this training session also was entered into evidence at trial. The government, without objection, described these tapes as including (1) references by participants

David Stout, who was not related to co-conspirator Everett Leon Stout, also testified, stating that, in April 2000, after responding to an advertisement that David Stout had placed in a magazine, Harmon used one of the "negotiable instruments" to "purchase" David Stout's house in Fayetteville, Arkansas for $150,000. However, although Harmon told David Stout that this "negotiable instrument" would serve to pay off the $149,000 mortgage on which David Stout still owed, and Harmon took possession of the house, the mortgage was never paid by the "negotiable instrument." Moreover, David Stout only regained custody of this house after filing a lawsuit in an Arkansas state court and receiving a favorable verdict in 2001.

Similarly, Leda Younce testified that, in May 2000, Harmon, who stated that he was in California visiting his brother, used one of Sovereign Accounting's "negotiable instruments" to "purchase" a Geo Tracker that Younce and her husband had decided to sell to pay off its loan. Harmon agreed to the price needed to pay off this loan and, as payment, told the Younces that the "negotiable instrument" would operate "like a regular check." Similar to the "negotiable instruments" used in Alabama, this "negotiable instrument" contained the name

to Harmon as a "conservator, a man who is high ranking and who has authority," and (2) instructions to participants that they needed to obtain Harmon's permission before conducting "business" through Sovereign Accounting.

Sovereign Accounting and referenced to an alleged judgment in "the Circuit Court of Crittenden County, Arkansas, case CV-99-744." After the "sale" was completed, Harmon mailed the original copy of the "negotiable instrument" to the finance company, and he left California with the vehicle. Approximately two weeks later, the Younces discovered that the "negotiable instrument" was worthless, and they began calling Harmon at his home number. Although the Younces complained to Harmon several times, Harmon replied that the method of payment was legal.[5]

In discussing the transportation of the vehicles at issue in Counts 9 and 10 of Harmon's superseding indictment, Mike Callahan, a special agent with the FBI testified that Harmon admitted to him in May 2002, that, sometime in late December 2001, Harmon and his grandson, Roman Oswald, had traveled with Stout and two other persons in one vehicle to Birmingham, Alabama, at which time Harmon, Oswald, and another person each had driven a separate vehicle back to Fayetteville. Harmon specifically had driven the vehicle that had been stolen from James Stuckey, while Oswald had driven the vehicle that had been stolen from Kevin Oakes. Although Harmon denied knowing that these vehicles were stolen,

_____

[5] This vehicle subsequently was returned to the Younces in May 2002, after the Federal Bureau of Investigations ("FBI") conducted a search of Harmon's home.

6

he admitted knowing that they were obtained using Sovereign Accounting's "negotiable instruments."[6]

Agent Callahan also testified that Harmon admitted to him that multiple vehicles had been stored at Harmon's residence at one time, and that Harmon knew that these vehicles had been obtained through the use of "negotiable instruments." Moreover, when Agent Callahan questioned Harmon about the vehicle Harmon had "bought" using a "negotiable instrument" in California, Harmon refused to answer, explaining that he feared that the evidence relating to the "sale" of the California vehicle would be used against him, and that he wished, instead, to work out a deal relating to its recovery. Harmon also informed Officer Callahan that he was in possession of two other vehicles that Stout had obtained, and that he would return them if evidence relating to their "sales" was not used against him. Agent Callahan, however, refused both requests to make a deal.

At the conclusion of the government's evidence, Harmon moved for a judgment of acquittal, arguing that "there [was] no evidence . . . that [he] had any intent to deceive any of the people set out in the indictment and did not knowingly drive or get his grandson to drive" the stolen vehicles across state lines. Reserving its judgment until "after the jury return[ed] its verdict," the court found sufficient

---

[6] Oswald testified that he, Harmon, and the third person drove these three vehicles to Harmon's home, after which they were distributed to various members of Harmon's family.

"information to put the question of whether the defendant knew that the vehicles were stolen to the jury." After Harmon chose not to testify, the jury convicted him of both counts in his indictment.

Harmon argues on appeal that the government failed to present sufficient evidence during his trial to support his convictions for conspiracy and interstate transportation of stolen vehicles. Harmon specifically contends that, although the government showed that (1) codefendant Stout obtained by deception several vehicles and caused them to be transported in interstate commerce, (2) Harmon used some form of worthless negotiable instrument to obtain title over a vehicle in California and a home in Arkansas, and (3) Harmon was acquainted with Stout, the government did not prove that Harmon exercised control over a vehicle in the Northern District of Alabama while knowing it to be stolen. Additionally, Harmon asserts that Agent Callahan's testimony on his interview with Harmon—evidence on which the government relied heavily—also did not show that Harmon acted with the requisite intent.

Whether sufficient evidence supports a conviction is a question of law subject to de novo review. United States v. Alaboud, 347 F.3d 1293, 1296 (11th Cir. 2003). "In assessing the sufficiency of the evidence, [we] view[] the evidence in the light most favorable to the government with all reasonable inferences and

8

credibility choices made in the prosecution's favor." Id. "A jury's verdict must be sustained against such a challenge if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

To convict under § 2312,[7] a provision of the National Motor Vehicle Theft Act, which is commonly known as the Dyer Act, a jury must find that the defendant transported in interstate commerce a motor vehicle with knowledge that it had been stolen. See United States v. Burns, 597 F.2d 939, 942-43 (5th Cir. 1979). To show participation in a conspiracy, such as a § 371 conspiracy,[8] the government must prove that "a conspiracy existed, that the defendant knew of it, and that the defendant with knowledge, voluntarily joined it." United States v. Pineiro, 389 F.3d 1359, 1368 (11th Cir. 2005) (quotation omitted). Thus, as both parties concede, the government was required to prove for each offense of conviction at issue here that Harmon acted with knowledge.

---

[7] Section 2312 provides that, "[w]hoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both." See 18 U.S.C. § 2312.

[8] Section 371 provides that, [i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." See 18 U.S.C. § 371.

9

In establishing the knowledge necessary to support a § 2312 conviction, the former Fifth Circuit explained as follows:

> Possession of a stolen automobile shortly after its theft 'justifies the inference that the possession is guilty possession, and, though only [p]rima facie evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence.'

United States v. Lambert, 580 F.2d 740, 743 (5th Cir. 1978). The former Fifth Circuit further explained in Burns that "the common law logical derivation of this inference is quite simple. One found in unexplained possession of recently stolen property likely is the thief or privy to the theft." Burns, 597 F.2d at 942.

In Burns, the former Fifth Circuit reviewed a district court's grant of a judgment of acquittal after the jury found the defendants guilty of violating the Dyer Act. See id. at 940. The Burns Court concluded that an inference of guilty knowledge was triggered by the fact that vehicles stolen in New York were found in the defendants' possession in Alabama, within a matter of days of the thefts. See id. at 945. Based on this inference, along with evidence relating to (1) the disparity between the price the defendants paid for the vehicles and their retail values, (2) fictional transactions, (3) forged public vehicle identification numbers ("VINS"), and (4) marks around the door locks which indicated forcible entries,

10

the Burns Court ultimately vacated the district court's grant of a judgment of acquittal. See id. at 945-46.[9]

Similarly, in Lambert, the former Fifth Circuit concluded that the defendants' receipt of eight vehicles within three days to three weeks from the dates on which they were stolen from their owners in other states was sufficient to create an inference that their possession of the vehicles was a guilty possession. See Lambert, 580 F.2d at 742-43. The Lambert Court further determined that the defendants failed to rebut this inference by offering evidence that they had paid a fair and adequate consideration for the automobiles, and by stating that they were acting under the orders of their employer, who was deceased at the time of the trial. See id. at 743. Moreover, the Lambert Court found that (1) the transactions were close and time and method, (1) the title documents on the automobiles were in disarray, (3) the defendant who testified could not explain the discrepancies in the bills of sale, and (4) the stolen vehicles had damaged locks and altered VINS. See id. at 744. The Lambert Court, therefore, concluded that there was sufficient evidence to support the jury's guilty verdict against one of the defendants. See id.

---

[9] In reaching its determination, the Burns Court noted that the case did not present the issue, and the Court need not decide, whether proof of the possession of recently stolen property, without more and irrespective of the remaining evidence, required the same result. See Burns, 597 F.2d at 943 n.7. Because the instant case involved evidence in addition to proof of recently stolen property, we also need not decide this issue.

In proving the requisite knowledge for a conspiracy offense, the government may show knowing participation in the conspiracy through either circumstantial or direct evidence, and it need only prove that the defendant knew of the general nature and scope of the conspiracy. Pineiro, 389 F.3d at 1368. "Although not controlling, presence and association are material and probative factors that a jury may consider in reaching its verdict."[10] United States v. Lluesma, 45 F.3d 408, 410 (11th Cir. 1995). Id. "A jury may infer knowledgeable voluntary participation from presence, when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." Id. Thus, we concluded in Lluesma that the evidence was sufficient for a reasonable jury to conclude that one of the defendants understood that shipping containers with stolen equipment were being exported to Venezuela when (1) a co-conspirator testified that everyone knew that the items were going to be exported, and that the co-conspirator had talked to the defendant about a high-level co-conspirator who had made money from exporting goods; and (2) the warehouse used to store these containers was located in a neighborhood with other import/export businesses. See id.

_____

[10] In Pineiro, we further explained that "[i]t is well-settled that the existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement. . . . The more common method of proving an agreement is through circumstantial evidence." See Pineiro, 389 F.3d at 1369 (quotation and internal marks omitted).

In the instant case, Harmon admitted to being in possession of the vehicles he transported or caused to be transported from Alabama to Arkansas in December 2001—the same month that they were stolen from Stuckey and Oakes. Thus, similar to the facts in Burns and Lambert, an inference of guilty knowledge existed. See Burns, 597 F.2d at 945, Lambert, 580 F.2d at 742-43. Moreover, Harmon admitted to Agent Callahan that he knew that these two vehicles were obtained through "negotiable instruments."

Although Harmon argues that he did not know that these "negotiable instruments" were not legitimate, this argument is belied by David Stout's testimony that, after Harmon attempted to use one of Sovereign Accounting's "negotiable instrument" to purchase David Stout's house in Arkansas, and after the mortgage was never paid, David Stout complained to Harmon and ultimately received a favorable verdict in a lawsuit against him. Younce similarly testified that, after she determined that the Sovereign Accounting "negotiable instrument" that Harmon had used in purchasing a vehicle she and her husband owned in California was worthless, she repeatedly complained of this fact to Harmon. Thus, even if Harmon did not know that these "negotiable instruments" were worthless before he attempted to use them to make these purchases, he subsequently learned of this fact. Indeed, when Agent Callahan questioned Harmon about the vehicle he

13

had purchased in California, Harmon replied that he was afraid to answer because he believed that the evidence would be incriminating.

Additionally, to the extent that Harmon's appeal can be construed as challenging whether sufficient evidence was produced to show that his participation in the conspiracy was knowing, the government introduced testimony from Hood that Stout gave the Hoods Harmon's home phone number to contact if they had difficulties with the sale, and that Hood subsequently talked to a person with Harmon's same first name. In explaining Stout's "business" activities, Lillard testified that Harmon served on Sovereign Accounting's "board," and he participated in a training session Sovereign Accounting conducted in early 2000, to teach other persons how to use its "negotiable instruments." The government also introduced a videotape of this training session, depicting Harmon as a person with authority in Sovereign Accounting and from whom other persons had to obtain permission to conduct "business." See Lluesma, 45 F.3d at 410 (explaining that "presence and association are material and probative factors that a jury may consider in reaching its verdict"). Moreover, Harmon conceded to Agent Callahan that he knew that multiple vehicles that Stout had stored at Harmon's residence had been obtained through "negotiable instruments,"along with asking Agent Callahan for a promise not to use evidence about these vehicles if Harmon returned them.

Accordingly, we conclude that a reasonable trier of fact, viewing the evidence in the light most favorable to the government, could have found, beyond a reasonable doubt, both that Harmon knew the vehicles he transported or caused to be transported in interstate commerce were stolen, and that he knowingly participated in a conspiracy to commit interstate transportation of stolen vehicles. Thus, Harmon's §§ 371 and 2312 convictions were supported by sufficient evidence. We, therefore, affirm.

**AFFIRMED.**