[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14689
Non-Argument Calendar

_____

D.C. Docket No. 2:16-cr-00451-VEH-TMP-1


UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

DANA MICHELLE FLIPPO,

Defendant–Appellant.


_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 7, 2019)


Before WILLIAM PRYOR, MARTIN and NEWSOM, Circuit Judges.

PER CURIAM:

Dana Flippo appeals her convictions for one count of conspiracy to possess with intent to distribute more than 50 grams but less than 500 grams of methamphetamine, 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and two counts of possession with intent to distribute 50 grams or more of methamphetamine, *id.* § 841(a)(1), 841(b)(1)(B). Flippo challenges the denial of her motion to suppress, the sufficiency of the evidence to support her convictions, and the denial of her motion for a judgment of acquittal. We affirm.

Four standards of review govern this appeal. On denial of a motion to suppress, we review findings of fact for clear error and the application of law to those facts *de novo. United States v. Touset*, 890 F.3d 1227, 1231 (11th Cir. 2018). We construe all facts in the light most favorable to the government. *Id.* When a defendant fails to renew her motion for judgment of acquittal at the close of the evidence, we will reverse a conviction only if "the record is devoid of evidence of an essential element of the crime or . . . the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013) (internal quotation marks and citation omitted). We review for plain error issues not presented to the district court. *United States v. Hunerlach*, 197 F.3d 1059, 1068 (11th Cir. 1999).

Traffic stops are seizures under the Fourth Amendment. *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009). A traffic stop is constitutional if it

2

is based on probable cause to believe that a traffic violation has occurred or is justified by reasonable suspicion that the person is engaged in a criminal activity. *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). When an officer "possesse[s] probable cause to believe that a traffic violation ha[s] occurred, the[] seizure of [a defendant] and his vehicle comports with the Fourth Amendment notwithstanding the[ officer's] subjective desire to intercept any narcotics being transported . . . ." *United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997). The existence of probable cause or reasonable suspicion is viewed from the standpoint of an objectively reasonable police officer. *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003).

The district court did not err by denying Flippo's motion to suppress based on an allegedly unlawful traffic stop. On June 14, 2016, Flippo, while under surveillance as a suspected drug dealer, was stopped by Deputies Brandon Streit and Darrius Black of the Jefferson County Sheriff's Department after she violated a traffic law by making a left turn "without giving an appropriate signal" within at least "100 feet . . . before turning," Ala. Code § 32-5A-133. Sergeant Jason Mize instructed the deputies to stop Flippo's white Cadillac Escalade if they observed her commit any traffic violation. It matters not that the stop was pretextual. Because the officers had probable cause to stop Flippo for a traffic violation, their "motive in making the traffic stop [did] not invalidate what [was] otherwise

objectively justifiable behavior under the Fourth Amendment," *Harris*, 526 F.3d at 1337 (quoting *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)).

Flippo challenges as incredible the deputies' testimonies that they observed her commit a traffic violation after having trailed her and Mize "for approximately fifteen to twenty minutes without incident," but Flippo omits intervening events that explain the deputies' conduct. Mize testified that he followed Flippo "fifteen to twenty miles" from Center Point to Gardendale, during which time Streit and Black separately joined the caravan as backup officers. During the trip, the deputies were not in a vantage point to observe Flippo violate a traffic law. As the caravan entered Gardendale, Mize instructed the two deputies to drive ahead and to park their vehicles in the parking lot of a church near the intersection of Highway 31 and Snow Rogers Drive. Mize continued to follow Flippo until she entered a trailer park in Gardendale, and then Mize radioed Streit and Black to be on the lookout for Flippo and to stop her if they observed her commit a traffic violation. The district court did not clearly err in crediting the deputies' testimony that they stopped Flippo for a traffic violation.

Flippo also argues that inconsistencies in the deputies' testimonies about when she activated her turn signal made their stories "dubious," but we give substantial deference to the finding that the officers observed a traffic violation, *see United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004). We cannot say the

4

officers' testimonies were "contrary to the laws of nature, or [were] so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id.* (quoting *United States v. Ramirez–Chilel*, 289 F.3d 744, 749 (11th Cir. 2002)). Both deputies testified that they observed Flippo approach the intersection and move into the turn lane without activating her turn signal. Deputy Streit also testified that he saw Flippo activate her signal right before she made a left turn. It is not inconceivable that the deputies would observe different events from their respective vantage points in their two patrol cars.

The district court also did not err by denying Flippo's motion to suppress. A strong odor of raw marijuana wafted out the driver's side window of Flippo's vehicle as Streit spoke with her and out the passenger's side window as Black talked to Flippo's boyfriend, Donain Rodriguez. That odor provided probable cause for the deputies to conduct a warrantless search of the vehicle. *See United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991). Black instructed Rodriguez to exit the vehicle and, during a pat down, Rodriguez reached under his jacket into a breast pocket on his shirt. When Black grabbed Rodriguez's hand to thwart him from obtaining a weapon, a baggie of marijuana fell out of his hand and landed on the ground. Black handcuffed Rodriguez and discovered a baggie of methamphetamine in another pocket. In the meantime, Flippo also exited her vehicle. Three to five minutes later, Deputy Anthony Sanford of the K-9 unit

5

arrived at the scene and his dog alerted to the presence of drugs in Flippo's vehicle. *See United States v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990). Deputies searched the vehicle and seized two sets of drug scales stored inside the console, $3,400 of currency from Flippo's purse, and one set of drug scales and 178 grams of methamphetamine concealed inside a zebra-striped tote located behind the passenger seat.

Flippo argues that the officers' accounts were untrustworthy because they provided inconsistent reasons why Sanford conducted the canine search, but we disagree. Mize recorded on his incident report that he sent Sanford to the scene after learning from Streit that Flippo and Rodriguez were acting nervously. Streit did not recall reporting any nervousness and testified that Sanford's canine sniffed the vehicle "[j]ust to be sure about ourselves and just let him, since he was there, to do it." These statements are not inherently inconsistent. *See Pineiro*, 389 F.3d at 1366. In any event, it makes no difference why Sanford went to the scene. The officers did not need a positive alert from the canine to search the vehicle. The officers' suspicions about the presence of drugs ripened into "probable cause [to search Flippo's vehicle] when, . . . [through its opened windows, the officers] detected what [they] knew . . . to be the odor of marijuana" and discovered two different packages of drugs in Rodriguez's possession. *See Tobin*, 923 F.2d at 1512.

The government presented sufficient evidence that Flippo and Rodriguez knowingly conspired to distribute methamphetamine through testimony from the officers who discovered incriminating evidence inside Flippo's vehicle after the traffic stop, from Zachary Smith, a confidential informant, who made a controlled purchase of methamphetamine from Flippo on June 7, 2016, and from officers who executed a warrant to search Flippo's home in Gardendale one week later. *See* 21 U.S.C. § 841. On the day of the traffic stop, after officers discovered contraband in Flippo's vehicle and purse, she admitted to Mize that she knew there were drugs in her car and that she routinely served as a translator for Rodriguez during drug transactions. *See United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009) ("If 'a defendant's actions facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole,' a single conspiracy is established."). Smith testified that, in January 2016, he began buying drugs to resell from Flippo at her homes in Gardendale and in Center Point. Smith observed drugs and drug scales in Flippo's kitchen, he watched Flippo weigh methamphetamine, he ordinarily bought drugs from either Flippo or Rodriguez, and both of them were present during four or five drug transactions. Corporal Neal Owings testified that he obtained a warrant to search Flippo's home after Smith returned from his controlled purchase in her Gardendale home with 1.9 grams of methamphetamine. Owens also testified that the search of Flippo's house resulted in the discovery of 235 grams of

7

methamphetamine; a bill of sale, correspondence from Alabama Power, and a pass to Six Flags in Flippo's name; a wallet containing two of Flippo's means of identification and drug scales in the master bedroom; a young man's clothing in a guest bedroom; and food and medicine inside cabinets in the kitchen. Officer Joel Gaston, who collected evidence inside Flippo's home, testified that she and Rodriguez returned home in her truck during the search and that officers seized from her truck a billfold containing about $1,000 in cash that was sitting next to a black leather purse. A jury reasonably could have found based on this evidence that Flippo and Rodriguez conspired to distribute methamphetamine.

The government also presented sufficient evidence to support Flippo's convictions for distributing methamphetamine. Smith's testimony about purchasing methamphetamine from Flippo on multiple occasions, Flippo's admission to Mize after the traffic stop that she knew of the 178 grams of methamphetamine in her vehicle, and the discovery of more than $3,000 in cash in her purse could have supported the jury's finding that Flippo possessed methamphetamine with the intent to distribute it on January 14, 2016. *See* 21 U.S.C. § 841(a); *United States v. Capers*, 708 F.3d 1286, 1297 (11th Cir. 2013). The jury also reasonably could have found that Flippo distributed methamphetamine on June 14, 2016, based on the contraband the officers

8

discovered inside her residence and the large amount of cash she had inside her truck when she returned home. *See id.*

Flippo argues, for the first time, that the district court erred in denying her motion for an acquittal for distributing methamphetamine on June 14, 2016, on the ground that the evidence seized from her home should have been suppressed as the fruits of an invalid search warrant. Because Flippo made a motion for a judgment of acquittal based on the insufficiency of the evidence after the government rested its case, "our review of the district court's decision to deny the motion for judgment of acquittal on [the specific ground that officers illegally seized property from her home is] only for 'plain error.'" *Hunerlach*, 197 F.3d at 1068. To prevail, Flippo must prove that an error occurred that is plain and that affects her substantial rights. *Id.*

No plain error occurred. Flippo argues that Corporal Owings "falsely misrepresented" in his affidavit for the search warrant that Smith "has given information in [the] past which has proved to be true and correct and has led to narcotics cases being made." But when Flippo asked Owings at trial whether his affidavit was false, Owings responded that Smith previously provided reliable information by "t[elling] a previous informant that he could sell marijuana and sold him marijuana." Owens provided a rationale for the statement he made in his

9

affidavit and Flippo did not pursue the matter further. Without more, we discern no error.

We **AFFIRM** Flippo's convictions.