[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-12951

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DONALD V. WATKINS, JR.,
DONALD V. WATKINS, SR.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:18-cr-00166-KOB-JEO-2

_____

Before NEWSOM, TJOFLAT, and ED CARNES, Circuit Judges.

TJOFLAT, Circuit Judge:

On April 26, 2018, a federal grand jury returned a sealed indictment against Donald Watkins, Sr., ("Senior") and his son, Donald Watkins, Jr. ("Junior"). On November 29, 2018, a ten-count superseding indictment was issued against Senior and Junior, alleging one count of conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349, seven counts of wire fraud, in violation of 18 U.S.C. § 1342 and § 1343, and two counts of bank fraud, in violation of 18 U.S.C. § 1342 and § 1344.

Both Senior and Junior pled not guilty. They were tried together, and both elected to proceed *pro se*. The trial lasted two weeks and consisted of testimony from more than 30 witnesses and the admission of more than 200 exhibits. The Government put on evidence showing that Senior and Junior had conspired to commit wire fraud when they solicited millions of dollars' worth of investments from wealthy and famous individuals like Charles Barkley, Takeo Spikes, and Bryan Thomas for the development of certain companies, including a company called Masada Resource Group, L.L.C. ("Masada").[1] Senior and Junior, the Government posited, secured the investments through several different fraudulent

---

[1] These companies included Masada Resource Group, L.L.C., MRG's parent company, Controlled Environmental System Corporation, Watkins Aviation, and Nabirm. We will refer to these entities collectively as Masada.

misrepresentations: (1) misleading the investors into believing Senior owned at least 50% of the interest in Masada, when in fact he was only the manager;[2] (2) misleading investors into believing the solicited funds would be used for business purposes, when in fact they were used to pay personal expenses and debts; and (3) misleading investors into believing high-profile individuals such as Condoleeza Rice and Martin Luther King III were heavily involved in the management of Masada, when in fact they were not.

The Government also put on evidence showing that Senior and Junior had committed bank fraud when they directed a former friend and business associate, Richard Arrington, to request two separate loans from Alamerica Bank for his own company while concealing the fact that the money was intended for Senior and Junior. Such deception was necessary, the Government argued, because Senior, the Chairman of Alamerica, had already borrowed the maximum amount on his line of credit at the bank.[3] At the conclusion of the Government's case, and again at the conclusion of all evidence, both Senior and Junior made a Rule 29 motion for judgment of acquittal.

The jury convicted Senior on all counts and Junior on counts one (conspiracy) and two (wire fraud). Both Senior and Junior

---

[2] Senior was appointed manager of Masada at some point in 2005 but did not possess ownership interests.

[3] Regulation O, 12 C.F.R. § 215.5, imposes a $100,000 maximum amount of credit a bank can extend to an "insider."

again filed motions seeking a judgment of acquittal notwithstanding the verdict or, alternatively, a new trial.  The District Court denied the motions, and sentenced Senior to 60 months of imprisonment and Junior to 27 months of imprisonment.

Both Senior and Junior appeal.  On appeal, Senior argues (1) that his conviction on all counts of wire and bank fraud should be reversed because the evidence was insufficient to establish the required intent to defraud under the wire and bank fraud statutes and (2) that his conviction on the conspiracy count should be reversed because Junior lacked the specific intent necessary to be convicted of a conspiracy and a successful conspiracy conviction requires at least two co-conspirators.  Alternatively, Senior argues that (1) that a new trial should be ordered on the wire and bank fraud charges because the District Court abused its discretion in refusing to define the element of "intent to harm" in its jury instructions for the wire and bank fraud charges and (2) that a new trial should be ordered because the District Court erroneously excluded and limited evidence that went to the heart of the case.

Junior argues (1) that the evidence was insufficient to support his conspiracy conviction and (2) that the evidence was insufficient to support his conviction of aiding and abetting Senior in wire fraud.

## I.

We review a verdict challenged for the sufficiency of the evidence *de novo*, resolving all reasonable inferences in favor of the

verdict. *United States v. Yost*, 479 F.3d 815, 818 (11th Cir. 2007) (citing *United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004)). This means that we cannot disturb the verdict "unless no trier of fact could have found guilt beyond a reasonable doubt." *Id.* at 818–19 (citing *United States v. Lyons*, 53 F.3d 1198, 1202 (11th Cir. 1995)).

We review a district court's refusal to give a proposed jury instruction for abuse of discretion. *United States v. Maxwell*, 579 F.3d 1282, 1303 (11th Cir. 2009) (citing *United States v. Ndiaye*, 434 F.3d 1270, 1280 (11th Cir. 2006)). The same standard of review applies for a district court's evidentiary rulings. *United States v. Brown*, 415 F.3d 1257, 1264-65 (11th Cir. 2005) (citing *Gen. Elec. Co. v. Joiner*, 552 U.S. 136, 141, 118 S. Ct. 512, 517 (1997)).

## II.

We first consider whether the evidence was sufficient to support Senior and Junior's convictions for wire fraud.[4] To be convicted of wire fraud, a person must "(1) intentionally participate[] in a scheme or artifice to defraud another of money or property and (2) use[] or 'cause[]' the use of the mails or wires for the purpose of executing the scheme or artifice." *United States v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011).

---

[4] The wire fraud charges consisted of counts two through eight. Counts two and three alleged that Senior and Junior used money wire transfers to defraud their victims, while counts four through eight alleged Senior and Junior used emails to do so.

6                    Opinion of the Court                    19-12951

        We consider Senior's convictions first.  Senior argues that there was insufficient evidence to establish the required intent to defraud under the wire fraud statute.  Under our precedent, a defendant intends to defraud when he "attempt[s] to obtain, by deceptive means, something to which he was not entitled."  *Bradley*, 644 F.3d at 1240; *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016).  Here, there was sufficient evidence to establish the required intent to defraud under the wire fraud statute.[5]

---

[5] Senior cites our recent decision in *Takhalov,* 827 F.3d at 1312, and argues that any conviction under the wire fraud statute requires proof of intent to *harm* the victim(s), and not merely proof of intent to *deceive*.  He argues that there was insufficient evidence to support a finding that he intended to harm any of his investors; instead, the most the Government could prove, he asserts, is that he used misrepresentations to induce his investors to enter into fair transactions they might not otherwise have entered into.

But the evidence was sufficient under *Takhalov* to sustain Senior's convictions.  That decision requires a defendant's "lies [to be] about the nature of the bargain itself."  *Id.* at 1313.  Senior's lies were.  He lied about how the investment money would be spent, which affected the nature of the bargain.  *See United States v. Wheeler*, 16 F.4th 805, 820–21 (11th Cir. 2021) (holding that a lie that investment money would be used to inject capital into the company to expand it or to conduct research and development, when in fact the money went to salespeople's commissions, was a lie that affected the value and nature of the bargain).

Senior also lied about high-profile individuals being involved with Masada, which affected the nature of the bargain.  *See id.* at 820 ("A reasonable jury could infer that facts like [the company's] association with a famous executive and globally recognized technology company, . . . are essential characteristics of the stock that would alter the nature of the bargain.").  And he lied about his creditworthiness when seeking a loan from Barkley by misrepresenting his

19-12951              Opinion of the Court                    7

Counts two through four concerned Senior's solicitation of a $150,000 loan from Barkley. Senior emailed Barkley on May 24, 2013,[6] seeking $150,000 to cover "April and May expenditures related to" his various business projects and to tide him over until he received an expected "allotment of working capital" on June 1. However, as the Government showed at trial, emails between Senior and Junior made clear that they intended to use the monies secured from Barkley to pay expenses entirely unrelated to Senior's business ventures, including a $5,000 payment to Deandra Watkins (Senior's ex-wife) and a $2,800 payment to Lamar Media for Junior's insurance business. Thus, although Barkley received a promissory note providing that his loan was "made and transacted solely for business purposes related to Masada Resource Group, LLC," the money was in fact intended (and used) for non-business purposes. A jury could therefore reasonably conclude that Senior intended to defraud Barkley—"to obtain, by deceptive means, [money] to which he was not entitled." *Bradley*, 644 F.3d at 1240.

Counts five and six concerned a separate set of solicitations, again directed at Barkley. On February 4, 2014, Senior emailed Barkley (and later Barkley's financial advisor) informing him that Senior was in discussions to sell Masada to a member of the royal

---

ability to pay the loan back. That lie, too, affected the nature of the bargain. *See United States v. Waters*, 937 F.3d 1344, 1357 (11th Cir. 2019) (holding that a borrower's creditworthiness "affect[s] the value of the transaction and was part of the bargain itself").

[6] Junior was copied on this email.

family of Saudi Arabia.  Senior told Barkley that in order to "complete this deal" Masada needed an "additional capital infusion of $1 million" and asked Barkley for an additional $1 million investment. He also asked Barkley to convert $2,000,000 of loans Barkley had previously made to Masada into equity in the company.  In return, Senior offered to upgrade Barkley's equity stake in Masada to "a 10% economic interest in all of Masada."  However, as the Government's evidence showed, emails between Senior and Junior showed that they in fact intended to use Barkley's investment not as a capital infusion but to pay certain personal expenses, including $100,000 in past-due alimony to Senior's ex-wife.  Based on all the evidence, then, a reasonable jury could conclude that Senior had intended to defraud Barkley—"to obtain, by deceptive means, [money] to which he was not entitled."  *Bradley*, 644 F.3d at 1240.

Finally, counts seven and eight concerned stakeholder reports Senior emailed to Barkley's financial advisor and other investor victims in June 2014 and January 2016.  At trial, the Government showed that Senior sent these emails in order to lull his victims into a false sense of security and into believing that their investments were being used for business purposes, rather than personal expenses.  *See United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2006) (noting that "letters designed to conceal a fraud, by lulling a victim into inaction, constitute a continuation of the original scheme to defraud") (citing *United States v. Georgalis*, 631 F.2d 1199, 1204 (11th Cir. 1980)).  Given the considerable testimony from investor victims suggesting that their receipt of such progress

19-12951                Opinion of the Court                9

updates led them to believe their investments were being used for legitimate business purposes, a reasonable jury could conclude that Senior sent the stakeholder reports to his investors to deter them from peering too closely into Senior's use of their investments.[7] As such, we cannot say that "*no* trier of fact could have found guilt beyond a reasonable doubt." *Pineiro*, 389 F.3d at 1367 (emphasis added).

Finally, we turn to Junior's wire fraud conviction under count two, which concerned Senior's solicitation of a $150,000 loan from Barkley. Junior argues that there was insufficient evidence to support his wire fraud conviction because the "record is entirely devoid of any false, fraudulent, or misleading statements by [Junior] to Charles Barkley." Our precedent makes clear, however, that "a defendant may be convicted of [wire] fraud without personally committing each and every element of [wire] fraud, so long as the defendant knowingly and willingly joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme." *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007) (footnote omitted).

---

[7] Senior argues that his convictions under counts seven and eight must fail because there was insufficient evidence to prove he intended to harm any of his victims and, as such, there was no fraudulent scheme to conceal. As we noted earlier, *see supra* n.5, however, a reasonable jury could have found that Senior intended to defraud Barkley by obtaining, through deceptive means, money to which he was not entitled.

Here the Government presented substantial evidence to establish beyond a reasonable doubt that Junior knowingly and intentionally participated in Senior's fraudulent scheme. Junior was copied on the May 24, 2013, email from Senior to Barkley, and he himself emailed Senior that very day stating, "We have no money left. I checked your email and mine and no word from Barkley." Senior replied, "I am surprised that Charles did not say yes. I am going to send two more emails out today. The money has to be there Tuesday." The Government also presented emails between Senior and Junior detailing the personal expenses to be paid from Barkley's loan. As the District Court noted, given Junior admitted to being the office manager and bookkeeper for his father's businesses, "the jury could reasonably infer that [Junior] knew that [the] funds from the loan could be used for *business* purposes only, and not to pay his *personal* expenses." A reasonable jury could therefore conclude that Junior knowingly and intentionally aided his father in committing wire fraud.

### III.

We next consider whether the evidence was sufficient to support Senior and Junior's convictions for conspiracy to commit wire fraud. Both Senior and Junior argue that the evidence was insufficient to support Junior's conviction—and Senior argues that, as a result, the evidence was insufficient to support his own conviction, as it takes at least two individuals to form a conspiracy.

To prove a conspiracy to commit wire fraud under 18 U.S.C. § 1349, the evidence must establish "(1) that a conspiracy [to

commit wire fraud] existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013) (quotation marks omitted) (quoting *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006)). "Because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998). Moreover, "the government need not prove that the defendant[] knew all of the detail[s] or participated in every aspect of the conspiracy," *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005), and "a defendant can be convicted [of conspiracy] even if his or her participation in the scheme is 'slight' by comparison to the actions of other co-conspirators." *Toler*, 144 F.3d at 1428.

Without a doubt, there was sufficient evidence to support Junior's, and therefore Senior's, conspiracy convictions. At trial the evidence showed that (1) Junior was Senior's "on the ground guy to oversee the administrative functions" of the business and that it was his job to make sure "whatever banking transactions needed to be done were done;" (2) Junior was included on multiple emails between Senior and the investors, many of which contained false statements; and (3) Junior himself devised a plan to solicit money from Charles Barkley, money that would be used to pay personal, not business, expenses. Indeed, the email in which Junior presented his plan to his father was sufficient to support a conviction

on the conspiracy count.  The subject line of the email was "Idea for Money," and the text was as follows:

> You need to consider going back to Barkley for one last million loan/investment.  I hate to go there but I don't think we have many more options.  Perhaps the Nabrim and uranium developments may be enough to pique his consideration. You need to call him as soon as you get back if not while you are over in Sierra Leone.  I can't make that call.
>
> If we do go back to him, and he sees his way clear to help us, the following have to be the payment priorities:
>
> $40,000 – 2009 GA and Fed income taxes
>
> $190,000 – FHG replacement of AB prepaid rent (into our FHG account)
>
> $105,000 – AMEX
>
> $125,000 – Rich Hewlett (we pay the other $125,000 a month or two later)
>
> $45,000 – Midland loan interest (2 quarters)
>
> $95,000 – past due bills, loan payments, fee payments and alimony
>
> $600,000 – TOTAL
>
> We hold on the remaining $400,000, no exceptions. We use that for monthly payroll and expenses until we decide for sure what we are going to do with the bank and building.

That's the only idea I have.

Donald Watkins, Jr.

Sent from my iPad2.

As the District Court correctly noted, a "jury could reasonably infer from this email [Junior's] involvement in a conspiracy with [Senior] to try to solicit funds from Barkley using false statements about business needs but using the proceeds for personal expenses and gain." *See also United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989) (noting that in order to find the evidence sufficient, one need not find the evidence "wholly inconsistent with every conclusion except that of guilt").

Thus, the evidence was sufficient to support Junior's conviction and, as a result, Senior's challenge to his own conspiracy conviction fails as well.

## IV.

We next consider whether the evidence was sufficient to support Senior's convictions for bank fraud. Senior again argues that he had no intent to harm Alamerica Bank and that, because of this, he could not have engaged in bank fraud.

Under 18 U.S.C. § 1344, an individual commits bank fraud by knowingly executing "a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, . . . or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

Here, the evidence was more than sufficient to support Senior's two bank fraud convictions.  The evidence at trial showed that in September of 2012, Senior sought to borrow $750,000 from Dr. Richard Arrington.  When Dr. Arrington indicated he did not have the financial assets to make such a loan, Senior instructed Dr. Arrington to seek out a loan from Alamerica Bank for his company, Jennro, L.L.C.  At the time, Senior—the Chairman of Alamerica Bank—had maxed out his available credit line at the bank and was not eligible for a loan in his own right.  Although Larry Tate, the President and Chief Executive Officer of Alamerica, testified that it was important for the Bank to "know the purpose of [a] loan or where the money will be spent" when deciding whether to approve a loan, and that Senior, as Chairman of the Board, would have been aware of this fact, neither Senior nor Dr. Arrington informed the Bank that the loan was really intended for Senior.

Instead, the day after Dr. Arrington's loan was approved, Senior texted Tate in the early hours of the morning and asked if the loan office could "finish Arrington's transaction today? He has some things he needs to take care of today."  When Tate responded that Dr. Arrington had indicated that the closing needed to take place within seven days, Senior responded: "[S]even days will not work.  It has to be completed today."  He followed up with another text stating "[T]his is critical."  Shortly after Dr. Arrington received the loan, he dispersed the funds at the direction of Junior.

Later in November of that year, Senior once again asked Dr. Arrington to loan him money ($150,000 this time) and again Dr.

Arrington represented to the bank that the loan was intended for Jennro business purposes. And Dr. Arrington once again disbursed the funds according to Junior's directions.

Senior argues that because no misrepresentations were made as to the requested loan amount or the terms of the agreement, it makes no difference that Senior and Dr. Arrington concealed the true recipient of the loan from Alamerica. That is, Senior seems to suggest a bank has no interest in truly knowing who it is lending its money to or what purposes they intend to put the money towards. Instead, as long as there "was no evidence of any misrepresentation of the amount of either loan (the price) or regarding the terms of either loan (the repayment terms Alamerica Bank bargained for in exchange)," then it matters not that Senior sought to conceal from Alamerica the fact that he was the true recipient of the loan.

This argument is plainly nonsensical. Banks have a clear interest in knowing to whom they are loaning money and for what purpose. Indeed, such information goes to the very nature of the "bargain" itself, as banks are not willing to provide loans to anyone and everyone, or for every purpose. *See Takhalov*, 827 F.3d at 1313 (holding that a "scheme to defraud" refers to schemes "in which a defendant lies about the nature of the bargain itself"). A jury therefore could have reasonably believed, given the evidence presented at trial, that Senior sought "to obtain, by deceptive means, something to which [he was] not entitled"—in this case, a loan from

Alamerica Bank. *Bradley*, 644 F.3d at 1240. The evidence was therefore sufficient to support Senior's bank fraud convictions.

## V.

Senior argues that the District Court abused its discretion in refusing to use his requested jury instruction for the wire and bank fraud charges. A district court's refusal to give a requested instruction is an abuse of discretion if (1) the instruction is correct; (2) the court did not address the substance of the instruction in its charge; and (3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense. *United States v. Sirang*, 70 F.3d 588, 593 (11th Cir. 1995).

The District Court did not abuse its discretion in denying Senior's proposed jury instructions on the "intent to harm" element of the wire and bank fraud charges. Even assuming, *arguendo*, that Senior's proffered jury instruction was a correct statement of the law, the District Court's instruction addressed the substance of the instruction in its charge and Senior's ability to present an effective defense was in no way impaired by the District Court's refusal to use his proposed instruction.

The District Court's instruction to the jury regarding what it means for a defendant to act with an "intent to defraud," "when viewed as a whole, fairly and correctly state[d] the issues and the law." *See United States v. King*, 751 F.3d 1268, 1275 (11th Cir. 2014) (quoting *United States v. Gonzalez*, 975 F.2d 1514, 1517 (11th Cir. 1992)). Under the District Court's instructions, the jury could not

have convicted Senior without finding that his misrepresentations were made with an intent to cause loss or injury to the individuals from whom he solicited money, *i.e.*, to obtain money to which he was not entitled. Furthermore, the District Court instructed the jury on the Senior's theory of defense, *i.e.*, that he had relied in good faith on the "authority granted by the applicable contractual agreements" and that he had a right, under those agreements, to "determine what constituted valid business purposes for expending the funds."

Accordingly, the District Court committed no reversible error in using the pattern jury instructions on the "intent to defraud" element of the wire and bank fraud chargers rather than Senior's requested instruction.

## VI.

Senior argues that the District Court abused its discretion when it excluded "defense evidence that went to the heart of the case." He should have been permitted, he argues, to introduce evidence regarding value of the economic interests he sold, as well as the economic value of his holdings in Masada and Nabirm, because this evidence was necessary to show that each investor received what he or she paid for.

A district court is "vested with broad discretion in ruling upon the relevancy and admissibility of evidence. Its ruling[s] will not be disturbed on appeal in the absence of clear abuse of that discretion." *United States v. Anderson*, 872 F.2d 1508, 1515 (11th Cir.

1989) (citations and internal quotation marks omitted).  This discretion, however, does not "extend to the exclusion of crucial relevant evidence necessary to establish a valid defense." *Id.* (quoting *United States v. Wasman*, 641 F.2d 326, 329 (5th Cir. Unit B 1981)).

The District Court did not abuse its discretion.  Although a defendant has a right to present crucial, relevant evidence to his defense, he does not have a right to introduce evidence that "does not bear a logical relationship to an element of the offense or an affirmative defense, whether direct or indirect." *United States v. Hurn*, 368 F.3d 1359, 1365 (11th Cir. 2004) (citing *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991)).  Here, the value of the Masada and Nabirm entities, their potential for growth, and even the value of the "economic participation interests" Senior sold was irrelevant to the charges Senior (and Junior) faced.

The Government's theory of the case was not that Senior and Junior had lied about the existence of Masada or Nabirm, the waste to ethanol technology involved, or the possibility that the companies were or could become successful.  Instead, the Government argued that Senior and Junior had misled investors into believing, among other things, that the solicited funds would be used for business purposes when in reality they intended to use the funds for personal expenses.  Proving that Masada was a successful, functioning company would do nothing to relieve Senior from liability for deceiving investors into believing their investment monies were going to business purposes rather than Senior and Junior's personal debts, alimony payments, and expenses.  As such, the

District Court's decision to exclude Senior's proffered evidence concerning the value of the economic interests sold and his personal holdings was not an abuse of discretion.

## VII.

For the foregoing reasons, the judgment of the District Court is

**AFFIRMED**.