[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-11316

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ELIZABETH GENNA SUAREZ,
f.k.a. Elizabeth Mirson Suit,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cr-80185-DMM-1

_____

Before ROSENBAUM, JILL PRYOR, and GRANT, Circuit Judges.

PER CURIAM:

After appellant Elizabeth Genna Suarez used a credit card belonging to a nonprofit organization to pay for her personal expenses, a jury convicted her of three counts of wire fraud. On appeal, she challenges her convictions, arguing that there was insufficient evidence of intent and that the jury returned an inconsistent verdict. After careful consideration, we affirm.

## I.

The criminal charges in this case arise out of Suarez's use of a credit card belonging to Piper's Angels Foundation (PAF), a nonprofit entity for which Suarez served as a board member. In this section, we introduce PAF and describe how Suarez, after marrying PAF's founder, misappropriated its funds. We then review the procedural history of her criminal case.

## A.

Travis Suit formed PAF in 2016 after his daughter, Piper, was diagnosed with cystic fibrosis.[1] PAF supports individuals who have cystic fibrosis and their families. It provides them with urgent

_____

[1] In this section, we set forth the facts viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's guilty verdict, as we are required to do. *See United States v. Boffil-Rivera*, 607 F.3d 736, 740 (11th Cir. 2010).

financial assistance to cover rent, utility bills, car payments, or medical expenses. In addition, PAF provides scholarships that fund trips for people with cystic fibrosis to experience saltwater activities such as paddleboarding or surfing. Suit wanted to encourage those with cystic fibrosis to engage in these activities after he learned of medical research showing improved outcomes for cystic fibrosis patients who are exposed to salt air environments.

To raise money to support these programs, since 2017 PAF has hosted an annual international paddleboarding event, known as the "Crossing for Cystic Fibrosis." In the Crossing, participants paddle approximately 80 miles from Bimini in the Bahamas to Florida. To participate in the event, paddlers donate money to PAF. The first paddler to complete the event in his or her age division wins a cash prize. Many paddlers who won these prizes ended up returning or donating the money they won to PAF.

The Crossing rapidly grew in size to become "the largest international paddleboarding event in the world." Doc. 72 at 117.[2] In its first year, PAF raised approximately $130,000 from the Crossing. In 2019, PAF raised over $500,000 from the Crossing, with approximately $100,000 coming from corporate sponsors.

PAF used a checking account at Bank of America as its operating account. During the relevant period, Suit was the sole signatory on the account. When an individual with cystic fibrosis needed urgent financial assistance, PAF often would mail the person a

---

[2] "Doc." numbers refer to the district court's docket entries.

paper check signed by Suit. Because these urgent needs could arise at any time, Suit often left a few signed blank checks with PAF's employees when he was traveling. Bank of America also issued PAF a debit card for the checking account. But PAF rarely used the card, which Suit kept at his home.

PAF also had a corporate credit card account with Chase Bank. Suit and two or three other individuals at PAF received corporate credit cards, which they used to pay for many of the organization's expenses, including those incurred in running the Crossing.

In late 2017, Suit and Suarez, who had previously been friends, began a romantic relationship. Within a few months, the couple was engaged. In June 2018, Suarez participated in the Crossing and won her division. She received a $3,000 purse prize. She did not keep the money; instead, she donated it back to PAF.

In October 2018, Suit and Suarez wed. After they married, Suarez took over responsibility for managing their household's finances as well as Suit's personal finances. Suit gave Suarez the login credentials for his personal Bank of America account so that she could pay bills. The login also gave Suarez access to online banking for PAF's checking account.

Shortly after the wedding, Suarez became a PAF board member. She took the lead on recruiting corporate sponsors for the Crossing event. She also volunteered to maintain the organization's books and track its financial transactions. Suarez requested

and received a PAF credit card from Chase. She was the only person who reviewed the transactions for her corporate credit card.

In 2019, PAF began to use APLOS, an accounting software program for non-profit organizations, to track its finances. APLOS allowed a user to code each expense transaction with a specific category for record-keeping purposes. PAF's treasurer, Kathy Aponte, assisted Suarez in creating the categories for coding the organization's transactions. The list of categories included payments for individual grants, which was what PAF called the urgent financial assistance provided to individuals with cystic fibrosis and their families; travel; repairs; program supplies; office supplies; and meals. After Aponte created the categories, Suarez alone was responsible for coding individual transactions.

In July 2019, Suarez used her PAF corporate credit card several times to pay for her personal expenses. On July 18, she used the card to pay $8,000 to the Center for Facial Restoration in Miramar, Florida, to cover the deposit for her future rhinoplasty surgery. On July 31, she charged $1,680.25 at New Age Dermatology, Inc., in West Palm Beach. This charge was for a laser skin resurfacing treatment designed to create a younger-looking appearance for Suarez, as well as an anti-aging sunscreen that she purchased.

On July 31, Suarez made two corporate credit card charges at stores at a Palm Beach Gardens mall. She used the card at Hamilton Jewelers to pay $802.50 to refurbish a necklace that was a

family heirloom of hers. And she used the card at a Billabong clothing store to purchase three pairs of men's swim trunks for $188.17.

Later, Suarez logged into the APLOS software to categorize these charges. She coded the charges from the Center for Facial Restoration and New Age Dermatology as "Grants-Individuals." Doc. 35-16 at 2, 4. For the Center for Facial Restoration charge, she added a comment that the rhinoplasty was for "reconstructive respiratory therapy." Doc. 72 at 225. She coded the charge from Hamilton Jewelers as "Fundraising" and the one from Billabong as "Program Supplies." Doc. 35-16 at 2.

Besides using PAF's credit card to pay for personal expenses, Suarez used other methods to take money that belonged to PAF. After marrying Suit, she regularly used his personal Bank of America credit card for her personal expenses. She then used Bank of America's online banking portal to transfer money from PAF's checking account to pay the amount owed on the credit card account. Over the course of a year, she spent $119,058 of PAF's money to pay personal credit card charges.

Suarez also used PAF's debit card to purchase personal items. She used the card to purchase a mattress, which cost approximately $3,300, and to buy items from Amazon.

In addition, Suarez wrote checks to herself from PAF's checking account. In June 2019, while Suit was traveling, she took two of the signed blank PAF checks he had left in case urgent financial assistance was needed for cystic fibrosis families in his absence and wrote them to herself in the amounts of $10,000 and $5,000.

On the memo line for one of the checks, she added a note to make it appear as though the check was the purse prize for coming in second place in her division at the 2019 Crossing event. Although Suarez had won $4,000 at the event, she had previously agreed that as a board member she would not accept any money.

When Suit learned about the checks, he confronted Suarez over text message. She responded that she had written the checks to increase the balance in their personal bank account "to show income" for their home loan application. Doc. 35-1 at 1. She said that she had "already initiated transfer[s] back to PAF so it will be a wash." *Id.* Suit responded, "So . . . you falsified our personal income with money from PAF to enhance our position in getting approved for a loan? Because if that's the case, that was a serious lapse in judgment." *Id.* at 2. Suarez replied, "I'm not sure why that's such a horrible thing" because "people leverage their businesses that way all the time." *Id.* at 3. She nevertheless apologized and promised, "[I]t will never happen again." *Id.* at 5.

Around the same time, PAF hired an outside firm, Templeton & Company, to handle its bookkeeping. When a PAF employee gathered credit card statements for Templeton, she saw charges on the July 2019 statement for Suarez's corporate card that appeared unrelated to PAF. The employee alerted Paul Smolchek, PAF's president. Smolchek reviewed the company's records and quickly identified over $48,000 in charges on Suarez's corporate credit card that appeared unrelated to the organization. He initially confronted Suit. Based on Suit's reaction, Smolchek was satisfied

that he had no knowledge of Suarez's misuse of the corporate credit card.

Smolchek then confronted Suarez. When asked about the charge at Hamilton Jewelers, she responded that it must have been "a gift for a [cystic fibrosis] family." Doc. 72 at 150. But she later admitted that "it was her necklace" and "she had made the charge." *Id.* at 157.

Suarez was removed from PAF's board. The board then hired a forensic accountant, Jeffery Danik. As part of his investigation, Danik interviewed Suarez twice. During those interviews, she admitted that she knew she could not use PAF's credit card for personal charges. She also admitted to making the purchase at Hamilton Jewelers.

Danik ultimately determined that Suarez misappropriated a total of $158,960 from PAF. He provided her with charts listing every improper charge, purchase, or transfer he had identified. After reviewing these charts, Suarez told Danik that "everything . . . on these lists were her charges." Doc. 73 at 105. She also stated that Suit "knew nothing about" her actions, saying he was "oblivious." *Id.*

After confessing to Danik, Suarez emailed PAF's board to apologize for her actions. She promised to repay the organization and said that she was seeking guidance "to get [her] moral compass pointing due north." Doc. 72 at 163.

**B.**

The government charged Suarez with four counts of wire fraud arising out of her use of PAF's credit card. Count One concerned the $8,000 charge at the Center for Facial Restoration, Count Two centered on the $1,680.25 charge at New Age Dermatology, Count Three concerned the $188.17 charge at Billabong, and Count Four arose from the $802.50 charge at Hamilton Jewelers.

Suarez pleaded not guilty, and the case proceeded to trial. At trial, the government's witnesses included Suit, Smolchek, and Danik. The government presented evidence about the incidents when Suarez misused PAF's credit card, transferred money from PAF's checking account to pay Suit's credit card balance, wrote checks to herself out of PAF's checking account, and used PAF's debit card to purchase personal items.

Suarez testified in her own defense. Although she admitted to using her PAF credit card at the Center for Facial Restoration and New Age Dermatology, she denied acting with any intent to "defraud or take from" PAF. Doc. 47 at 80.

According to Suarez, she could charge her rhinoplasty surgery to PAF because she needed the surgery to correct a breathing problem, and the surgery would allow her to participate in the Crossing in future years. She also testified she was permitted to charge the surgery to PAF because she was building a relationship with the Center for Facial Restoration in hopes of persuading the company to donate $100,000 to be the title sponsor for the Crossing

the next year. She said that Suit had told her to do "whatever [she] need[ed] to do to close sponsors" and had set an "example of doing business with sponsors and . . . building and maintaining those sponsor relations." *Id*. at 77.

She offered similar testimony to justify her use of PAF's credit card at New Age Dermatology. She suggested that she could charge her laser facial treatment and sunscreen to PAF because she sustained "serious skin damage" from participating in the Crossing. *Id*. at 78. And she testified that she was permitted to charge amounts spent at New Age Dermatology to PAF because she "was hoping" to land the company as a future corporate sponsor for the Crossing. *Id*. at 79.

Suarez denied using the PAF credit card at Hamilton Jewelers or Billabong. She told the jury that Suit had taken her credit card and made both purchases. When Suit testified, however, he denied making either purchase.

The jury found Suarez guilty of the wire fraud charges in Counts One, Two, and Four. But it found her not guilty of Count Three, the wire fraud charge based on the Billabong purchase. The district court denied Suarez's Rule 29 motion made during trial, as well as her post-trial motion for a judgment of acquittal. The court ultimately imposed a total sentence of 18 months' imprisonment followed by a two-year term of supervised release. This is Suarez's appeal.

## II.

We review *de novo* a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015). We will affirm the denial of a motion for judgment of acquittal if a reasonable trier of fact could conclude that the evidence established the defendant's guilt beyond a reasonable doubt. *United States v. Holmes*, 814 F.3d 1246, 1250 (11th Cir. 2016). We view the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's guilty verdict. *United States v. Boffil-Rivera*, 607 F.3d 736, 740 (11th Cir. 2010).

"We review *de novo* whether inconsistent verdicts render a conviction improper." *United States v. Green*, 981 F.3d 945, 960 (11th Cir. 2020).

## III.

Suarez raises two arguments on appeal. First, she argues that the evidence was insufficient to support her convictions for Counts One and Two, which concerned the credit card charges at the Center for Facial Restoration and New Age Dermatology. Second, she argues that the jury rendered an inconsistent verdict when it convicted her of Count Four, for the charge at Hamilton Jewelers, but acquitted her on Count Three, for the charge at the Billabong store. We address each argument in turn.

### A.

We begin with Suarez's challenge to the sufficiency of the evidence for Counts One and Two. She argues that the government failed to prove beyond a reasonable doubt that she acted with the intent to defraud. Instead, she maintains, the trial evidence showed that she honestly believed she could use the organization's money for a rhinoplasty, a laser facial, and sunscreen because she was trying to secure sponsors for the Crossing.

To convict a defendant for wire fraud, the government must prove, among other things, that the defendant had an "intent to defraud." *United States v. Watkins*, 42 F.4th 1278, 1282 (11th Cir. 2022). A defendant intends to defraud when she "attempts to obtain, by deceptive means, something to which [s]he was not entitled." *Id.* (alteration adopted) (internal quotation marks omitted). "A jury may infer intent to defraud from the defendant's conduct." *United States v. Maxwell*, 579 F.3d 1282, 1301 (11th Cir. 2009). Evidence that a defendant personally profited from the fraud may serve as circumstantial evidence of intent. *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

"Good faith is a complete defense to the element of intent to defraud." *United States v. Williams*, 728 F.2d 1402, 1404 (11th Cir. 1984). "[A] finding of specific intent to defraud necessarily excludes a finding of good faith." *United States v. McNair*, 605 F.3d 1152, 1201 n.65 (11th Cir. 2010).

The jury reasonably could have concluded that Suarez acted with the intent to defraud when she used PAF's credit card at

the Center for Facial Restoration to pay an $8,000 deposit for her rhinoplasty surgery and at New Age Dermatology to pay more than $1,600 for a laser skin resurfacing treatment designed to create a younger-looking appearance and an anti-aging sunscreen. Suarez admitted at trial that she made both of these credit card charges. Because these charges were for services or products that benefitted or would benefit Suarez personally and would not benefit PAF, the jury could infer that she acted with an intent to defraud. *See Bradley*, 644 F.3d at 1239.

True, Suarez testified that she honestly believed she could use the organization's money to cover personal expenses so long as she was acting with the goal of securing sponsorships for PAF. But her testimony was directly refuted by Smolchek, who testified that PAF could not spend money to "buy" sponsorships in this way. Doc. 72 at 187. The jury was not required to accept Suarez's testimony as true and instead could have made "adverse determinations about [her] credibility and reject[ed] [her] explanation as a complete fabrication." *United States v. Chalker*, 966 F.3d 1177, 1188 (11th Cir. 2020) (internal quotation marks omitted).

Other evidence in the record also supported an inference that Suarez was not acting in good faith and instead intended to defraud. She admitted to Danik that she knew she could not use PAF's credit card to pay for personal charges. Also, after making the charges at the Center for Facial Restoration and New Age Dermatology, Suarez coded the charges in PAF's accounting software as individual grants. It was reasonable for the jury to conclude that

Suarez purposefully mislabeled these expenses to make the charges look legitimate and to cover up her illegal actions. And her email to the PAF board apologizing for her conduct could be construed as an acknowledgment of wrongdoing and deceit. Moreover, although the government did not charge Suarez with any crimes based on the incidents when she repeatedly transferred money from PAF's checking account to pay off a personal credit card, wrote herself $10,000 and $5,000 checks from PAF's checking account, or purchased a mattress with PAF's debit card, the jury could have concluded that these similarly fraudulent actions were indicative of her intent to defraud with respect to the purchases made at the Center for Facial Restoration and New Age Dermatology. *See United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) (explaining that a defendant engaging in a similar act, even though uncharged, is "probative with regard to a defendant's intent in the charged offense").

After reviewing the record, we conclude that a reasonable trier of fact could have found that the evidence established beyond a reasonable doubt that Suarez acted with an intent to defraud. We thus affirm her convictions on Counts One and Two.

## B.

Suarez challenges her conviction on Count Four on a different ground. She says that the jury's guilty verdict on this count was "inconsistent" with the not-guilty verdict on Count Three, and thus her conviction on Count Fourt must be set aside. Appellant's

Br. 1. But, as Suarez acknowledges, this argument is foreclosed by our precedent.

Even assuming Suarez is correct that the jury rendered inconsistent verdicts on Counts Three and Four, we have long held that a guilty verdict on one count "must stand, even in the face of an inconsistent verdict on another count" so long as it is supported by sufficient evidence. *United States v. Mitchell*, 146 F.3d 1338, 1345 (11th Cir. 1998). And Suarez concedes that there was sufficient evidence to support her conviction on Count Four.[3] So we affirm her conviction on Count Four.

**AFFIRMED.**

---

[3] Even without this concession, we would conclude that there was sufficient evidence to support the jury's verdict on Count Four. Although Suarez denied making the charge at Hamilton Jewelers and instead said that Suit was the one who made the purchase, Suit testified that he did not make the purchase. And both Smolchek and Danik testified that Suarez admitted to making the charge at the jewelry store. The jury could have resolved this conflict in the evidence by finding Suarez's testimony not credible and concluding that she made the charge at Hamilton Jewelers. And for the reasons given in Section III-A above, the jury could have concluded that Suarez acted with an intent to defraud when she charged the cost of refurbishing her necklace to PAF.